2025 IL App (2d) 240087-U
No. 2-24-0087
Order filed September 29, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* COMMITMENT OF JOSEPH R. RACANELLI | ) ) ) ) ) ) | Appeal from the Circuit Court of Lake County. |
| | | No. 07-MR-143 |
| (The People of the State of Illinois, Petitioner-Appellee v. Joseph R. Racanelli, Respondent-Appellant). | ) ) ) ) | Honorable Theodore S. Potkonjak, Judge, Presiding. |

_____

JUSTICE Birkett delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The State was not prohibited from calling an independently retained expert at trial, and the trial court did not abuse its discretion in finding that respondent knowingly and voluntarily waived his statutory rights to counsel and to be present at the dispositional hearing.

¶ 2    In these proceedings under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq*. (West 2022)), respondent Joseph R. Racanelli appeals from the trial court's orders: (1) denying his motion to bar the testimony of the State's retained expert witness; (2) finding respondent knowingly and voluntarily waived his statutory right to counsel during posttrial proceedings; and (3) finding respondent knowingly and voluntarily waived his statutory right to be present at the dispositional hearing.  We affirm.

¶ 3                                I. BACKGROUND

¶ 4     On February 1, 2007, the State filed a petition seeking to have respondent adjudicated a sexually violent person (SVP) under the Act and committed to the care and custody of the Illinois Department of Human Services (the Department).  The petition alleged that, on July 14, 2006, respondent pleaded guilty to aggravated criminal sexual abuse (720 ILCS 5/12-15(b) (West 2006)), a sexually violent offense as defined in the Act (725 ILCS 207/5(e) (West 2006)), and was sentenced to three years' imprisonment in the Illinois Department of Corrections (IDOC) and two years of mandatory supervised release (MSR).  In support of the petition, the State attached a certified copy of respondent's conviction and a written evaluation dated January 30, 2007, prepared by Dr. Ray Quackenbush, a licensed clinical psychologist and SVP evaluator for the IDOC.  In that evaluation, Dr. Quackenbush diagnosed respondent with: (1) paraphilia not otherwise specified (non-consenting persons); and (2) personality disorder not otherwise specified, with narcissistic and antisocial features.  The petition further alleged that, due to these disorders, respondent presented a danger to others, and it was substantially probable that respondent would engage in future acts of sexual violence.  That same day, the trial court entered an order of detention and appointed Scott J. Spitalli, who was then under contract with the Lake County public defender's office, to represent respondent.

¶ 5     Following a probable cause hearing on February 5, 2007, at which Dr. Quackenbush testified, the court found probable cause to believe respondent was an SVP and ordered that he be detained by the Department for evaluation pursuant to the Act.  He was transferred to the Rushville Treatment and Detention Facility (TDF).

¶ 6     On March 5, 2007, respondent was evaluated by Dr. Robert Brucker, Jr. for the Department, who submitted a 21-page report to the court.  After Dr. Brucker was no longer under

contract with the State of Illinois, Dr. Richard Travis was assigned to evaluate respondent for the Department.

¶ 7     On April 11, 2007, at respondent's request, the trial court appointed Dr. Ronald Baron to perform an examination as contemplated in section 25(e) of the Act, which provides any person who is the subject of an SVP petition with a statutory right to retain an independent expert or professional (725 ILCS 207/25(e) (West 2006)).  Thereafter, the matter was continued numerous times for status of Dr. Baron's report.

¶ 8     On January 16, 2008, the trial court granted Spitalli leave to withdraw over the State's objection.  In the motion to withdraw, Spitalli cited irreconcilable differences and noted that respondent had expressed distrust of court-appointed counsel.  That same day, the court appointed Ian S. Kasper to represent respondent.

¶ 9     On September 17, 2008, respondent filed a motion requesting the appointment of a new expert evaluator.  The motion claimed that Dr. Baron's reports were inadequate because they failed to opine as to respondent's mental state or assess his likelihood of committing future acts of sexual violence.  On November 6, 2008, over the State's objection, the court granted respondent's motion and appointed Dr. Luis Rosell to evaluate respondent under section 25(e) of the Act.  The matter was again continued numerous times for the status of Dr. Rosell's report.

¶ 10     On June 7, 2010, the State requested that the trial court direct the IDOC to assign a new evaluator to conduct an updated evaluation of respondent, citing Dr. Quackenbush's retirement. The court granted the request without objection and ordered the IDOC to appoint a new evaluator. Respondent's counsel noted on the record that "the delays have been because of the Respondent." The IDOC assigned Dr. Deborah Nicolai to evaluate respondent.   The matter was continued for status of Dr. Nicolai's and Dr. Rosell's reports.  Thereafter, Dr. Nicolai reevaluated respondent

and submitted two reports dated December 3, 2010. On September 12, 2011, citing "problems *** moving the case forward with" Dr. Rosell, respondent requested the appointment of Dr. Eric Ostrov to evaluate him pursuant to section 25(e) of the Act.

¶ 11　　On October 6, 2011, private attorney James Schwarzbach filed his appearance on respondent's behalf, and the court discharged Kasper.

¶ 12　　On March 2, 2012, at respondent's request, the court struck its prior order of September 12, 2011, appointing Dr. Ostrov, as Dr. Ostrov had not yet undertaken any work on respondent's behalf. Respondent instead requested that Dr. Rosell be reappointed to evaluate him for purposes of determining whether he met the criteria for an SVP. The matter was continued multiple times to allow Dr. Rosell to complete his evaluation, which he ultimately did on November 25, 2013.

¶ 13　　On April 6, 2015, respondent made an oral motion to have Dr. Rosell complete an updated report, which the trial court granted. Dr. Rosell completed his updated report on October 19, 2015.

¶ 14　　On July 14, 2015, the State moved to have Dr. Nicolai conduct a new evaluation of respondent and submit an updated report incorporating the DSM-5 and any newly available records. The motion noted that Dr. Nicolai had previously submitted a report in 2010 and an addendum in 2014 addressing the DSM-5, but the addendum was "not a complete updated report." Respondent objected, arguing that under the Act, the State was "not allowed to have [its] experts continually update for tactical and for litigation purposes." After a hearing on December 15, 2015, the trial court granted the State's motion and ordered both Dr. Nicolai and Dr. Travis to conduct updated evaluations and provide updated reports. In so ruling, the court commented that the State was "putting themselves at peril by asking for an updated evaluation because, if [respondent] is doing what he says he's doing, then they run the risk of having their experts come back and say [respondent] is not SVP, doesn't meet criteria."

¶ 15    In May 2018, Dr. Travis—who had previously opined that respondent was an SVP—submitted an updated report in which he concluded that, due to respondent's progress in treatment over the years, he was no longer substantially probable to engage in acts of sexual violence. Based on the updated report, the State informed the trial court that it would no longer call Dr. Travis as a witness at trial, and it asked that an expert of their choice, Dr. Barry Leavitt, be permitted to evaluate respondent. Respondent objected, emphasizing that the case had "gone on many years" and that Dr. Travis had previously testified at a hearing and given deposition testimony. The State asserted that Dr. Travis did not "all of a sudden just switch his mind," but rather revised his opinion due to the time respondent spent in the Department and the treatment he had undergone during that period. Over respondent's objection to the State bringing "in an expert so close to trial where we are demanding speedy trial," the trial court granted the State's request and appointed Dr. Leavitt to evaluate respondent. The court noted that conflicting expert opinions from the parties would present a jury question, but the State was nevertheless entitled under the Act to have Dr. Leavitt appointed.

¶ 16    On April 16, 2019, respondent filed a motion to bar Dr. Leavitt from testifying at trial, arguing that the State was not entitled to an additional expert witness under section 25(e) of the Act, asserting that "the prosecution in this cause is entitled to one appointed expert." On April 19, 2019, which was the final pre-trial hearing, the court heard respondent's motion to bar Dr. Leavitt from testifying at trial. Respondent argued that, under section 35(b) of the Act (725 ILCS 207/35(b) (West 2018)), the State was permitted to present expert testimony at trial only from the IDOC evaluator and the Department psychologist, Drs. Nicolai and Travis, respectively. He contended that the State had "no right under section 35 to declare their own expert witness," asserting that while the State may do so in probable cause or dispositional proceedings, it lacked

that authority at trial under a "strict reading" of section 35. Respondent further argued that the State had consistently relied on the IDOC evaluator and Department psychologist in preparing for trial until Dr. Travis changed his opinion. In response, the State argued that nothing in the Act prohibited it from retaining its own expert, citing section 25(e) as affirmatively granting it the right to choose an expert for purposes of examination and trial. The trial court denied respondent's motion, stating, "[b]ased on what I have in front of me, in my reading of the statute, I don't see anything that prevents the testimony of Dr. Leavitt, notwithstanding arguments of counsel."

¶ 17     On April 22, 2019, over respondent's objection, the trial court granted the State leave to file an amended SVP petition. The amended petition omitted Dr. Travis' diagnosis and relied only on the diagnoses provided by Dr. Nicolai. Attached to the amended petition was Dr. Nicolai's supplemental examination report dated September 30, 2017.

¶ 18                                    Jury Trial

¶ 19     The matter proceeded to a jury trial on April 22, 2019, where respondent was represented by Schwarzbach. The trial was presided over by Judge Theodore Potkonjak. The State presented evidence that respondent met the criteria for commitment as an SVP under the Act because he had been convicted of a sexually violent offense and suffered from a mental disorder that made it substantially probable that he would engage in future acts of sexual violence if released. To prove that respondent had been convicted of a sexually violent offense, the State submitted a certified copy of his July 2006 conviction for aggravated criminal sexual abuse. To establish that respondent suffered from a qualifying mental disorder that made him dangerous to others because he was substantially probable to engage in acts of sexual violence, the State presented the testimony of Drs. Nicolai and Leavitt, both licensed clinical psychologists and experts in sex

offender evaluation, diagnosis, and risk assessment, each of whom opined that respondent met the statutory criteria to be adjudicated an SVP.

¶ 20                                    Dr. Deborah Nicolai

¶ 21    Dr. Nicolai testified that she was initially assigned to evaluate respondent in 2010. When she met with respondent at the TDF on November 24, 2010, he declined to participate in a clinical interview. Nicolai explained that the evaluation process remained the same, but that it was "minus the clinical interview." She conducted her evaluation by reviewing a broad range of documents, including police reports, court documents, respondent's criminal history, his IDOC master record file, medical files, prior evaluations, Department records, hospital records, and records from the TDF, such as clinical progress notes, recreational therapy notes, behavioral committee notes, and incident reports. Respondent had "[q]uite a large file."

¶ 22    Dr. Nicolai reviewed respondent's criminal history to evaluate whether it demonstrated a pattern of behavior indicative of a mental disorder. This information was also necessary for scoring the actuarial risk assessment. The records demonstrated that respondent was arrested in June 2004, when he was 17 years old, and charged with criminal sexual assault in connection with an incident involving a 13-year-old girl. Police reports indicated that the victim entered a basement bedroom with respondent, whom she knew only as "Joe." Respondent locked the door, pinned the victim down, fondled her vagina, and forced his penis into her vagina, all while she tried to push him away and repeatedly told him to stop. During the assault, the victim pinched respondent in an attempt to make him stop, but it only seemed to "ma[ke] him stronger." Respondent stated at the time that the victim was his girlfriend and that he believed she was 15 or 16 years old. The victim told police that she was "in Special Ed." In December 2004, Respondent pleaded guilty to criminal

sexual abuse and was sentenced to 24 months' special probation and six months of electronic house arrest.

¶ 23    In August 2005, when he was 18 years old and serving a term of probation for that offense, respondent was arrested for sexually assaulting a nine-year-old female relative. The victim reported that respondent had repeatedly sexually assaulted her over a period of two years. In one incident, respondent turned her over onto her stomach, held her down and, in the victim's words, " 'put his private in [her] butt.' " The victim also reported "numerous incidents that were similar," and respondent told the victim not to tell anyone. Respondent pleaded guilty to aggravated criminal sexual abuse, which is a sexually violent crime under the Act, and was sentenced to three years imprisonment followed by two years of MSR.

¶ 24    As part of her evaluation, Dr. Nicolai also considered respondent's conduct while housed in the TDF. She explained that the TDF offered "an intensive five-phase treatment program designed to provide sexually violent persons with tools and skills to *** help reduce risk to sexually re-offend." Respondent signed a consent for treatment, which is part of phase one, "almost right away." In July 2007, respondent began participating in psychological assessments and testing, as well as began attending sex offender treatment groups, which are part of phase two of the program. Phase two, called "Accepting Responsibility," requires participants to fully disclose the predicate offense as well as their complete sexual offense history, including any unreported incidents. After making these disclosures, participants are administered a polygraph test to "create an honest, open basis for treatment." Respondent's participation was sporadic. In December 2007, respondent failed his first predicate polygraph test by denying penetration of the victim in the predicate offense and "quit in March of 2008." Respondent returned to treatment in August 2008 but failed another polygraph in January 2009 and, once again, dropped out of

treatment. He returned to treatment in January 2012 and disclosed that he had sexually assaulted additional victims beyond the nine and thirteen-year-old girls. Initially, he disclosed that he had sexually assaulted seven victims of "hands on" or contact offenses, but he failed a polygraph in December 2012. Respondent reported that he did not want to "disclose too much" because he did not want to be "diagnosed as a sexual sadist." Respondent later disclosed ten hands-on victims, as well as reported that he had exposed himself to people over 1,000 times. He passed a polygraph examination in October 2013 and subsequently revised his sexual offense history to include the additional victims, after which he advanced to phase three of the program in March 2015. Dr. Nicolai described phase three as "Self-Application," in which the individual uses the work completed in phase two to construct a sexual assault cycle. Participants identify patterns in their offending, examine their unhealthy choices that lead to offending, and develop "exit options" to facilitate healthier decision making that avoids sexual offending. Respondent identified his high-risk factors and cognitive distortions, which are "mistakes in thinking" that "facilitate[] sexual offending," and completed phase three in April 2017.

¶ 25　Respondent advanced to phase four in June 2018. Dr. Nicolai testified that phase four, known as "Incorporation," is a critical stage in which the individual applies everything learned about themselves and their cycle of offending to their current daily life. At this stage, participants are expected to recognize high-risk situations, high-risk factors, and any triggering cognitive distortions as soon as they occur and intervene to prevent those distortions from perpetuating the cycle of offending. While in phase four, respondent received a "major rule violation" for disruptive conduct in court, which required the Lake County emergency response team to escort him from the courtroom. Then, in September 2018, the TDF intercepted a letter that respondent wrote to his girlfriend—a former dietary worker at the TDF who had distributed sexually explicit

photographs of herself to other residents—which contained a "lot of very concerning statements and contents," including descriptions of sexual fantasies involving coercion, violence, and pain. Dr. Nicolai found it relevant that respondent was engaged in what "his treatment team believes is an unhealthy relationship" during phase four, a stage in which he was "supposed to be reducing deviant sexual arousal and increasing healthy sexual arousal." The letter's contents related to several of respondent's cognitive distortions. Dr. Nicolai stated that she had testified approximately 45 times in SVP cases; 38 times for the State and seven times for respondents. Of those 45 cases, this was the only case where the respondent was at phase four of treatment, which she agreed was a "very unusual" circumstance. Dr. Nicolai described phase five, known as "Transition," as the stage in which participants are prepared for successful community living with continued support. Its purpose is to prepare respondents for conditional release if found to be an SVP.

¶ 26    Dr. Nicolai's overall assessment of respondent was that, although he had demonstrated a commitment to attending groups and had completed the requirements necessary to progress through the phases, his participation was "based on inconsistencies and falsities," reflecting a disingenuous commitment to genuine change. She explained that respondent had not internalized the treatment concepts into his daily life in a manner that was consistent with efforts to achieve healthier functioning.

¶ 27    Regarding whether respondent had any mental disorders, Dr. Nicolai testified that she relied on the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), in formulating her diagnoses. She opined that respondent met the criteria for "other specified paraphilic disorder, sexually attracted to nonconsenting females," "pedophilic disorder nonexclusive type sexually attracted to females," and antisocial personality disorder.

¶ 28    Dr. Nicolai explained that paraphilia is an intense and persistent sexual interest in activities other than sexual interest in genital stimulation or prefatory fondling with a "normal, physically mature, consenting human partner."  She further explained that paraphilia becomes a paraphilic disorder when it causes distress or impairment to the individual or involves harm or risk of harm to others.  Additionally, she stated that the DSM-5 "other specified" category is used when symptoms of a disorder predominate but do not meet the criteria for any of the specifically listed diagnoses.  In the context of paraphilic disorders, "other specified" applies when a paraphilia is present but is not among the eight paraphilias specifically listed in the DSM-5.  She noted that there are "many dozens of paraphilias" beyond those expressly listed.  Dr. Nicolai opined that respondent met the criteria for other specified paraphilic disorder because he "has established sexual behaviors, urges and fantasies indicative of sexual interest in non-consenting females, sexual behavior with non-consenting females," that is "persistent in duration."  She noted that both of respondent's convictions involved "force of non-consenting females" and qualified respondent's paraphilic disorder as being "in a controlled environment" because he was in a restrictive setting that provided him "little or no opportunity" to act on his urges.

¶ 29    Dr. Nicolai also diagnosed respondent with pedophilic disorder because he demonstrated sexual arousal to a prepubescent child, namely in the 2005 offense, whom respondent had sexually abused from the time she was seven until she was nine and, according to Dr. Nicolai, he "reported masturbating to euphoric recall" afterwards.  Dr. Nicolai acknowledged that, in 2008, respondent was given a penile plethysmography (PPG) assessment, which did not show clinically significant arousal in response to images of prepubescent children.  Instead, it showed "significant arousal to teen, female teen persuasive, and female adult exhibitionism."  Nevertheless, Dr. Nicolai found

her diagnosis of pedophilic disorder confirmed because of respondent's report that he had sexually assaulted a child over several years.

¶ 30    Lastly, Dr. Nicolai diagnosed respondent with antisocial personality disorder, which is "a pervasive pattern of disregard for violation of rights of others occurring since age 15." She explained that the DSM-5 identifies seven possible criteria for the disorder, of which an individual must meet at least three to qualify for the diagnosis. Dr. Nicolai testified that respondent showed six facets of the DSM-5 criteria for antisocial personality disorder, including: failure to conform to societal norms with respect to lawful behavior; deceitfulness, such as lying or conning others; impulsiveness; irritability or aggressiveness; disregard for the safety of self or others; and lack of remorse. She opined that these mental disorders caused respondent serious difficulty in controlling his sexually violent behavior and impaired his ability to refrain from such conduct.

¶ 31    Dr. Nicolai also conducted a comprehensive risk assessment to evaluate respondent's likelihood of sexual reoffending, which included the Static-99R and Static-2002R actuarial instruments and considering dynamic and protective factors. She described the Static-99R as an empirically derived risk-assessment instrument used to evaluate the likelihood of sexual recidivism in adult male sex offenders. It examines risk factors "that do not change." Respondent scored a five on the Static-99R, which placed him in the above average risk category, meaning he was 2.67 times more likely to reoffend than a "typical sex offender who scores a two on this instrument." She also used the Static-2002R, which she testified "adds incremental validity." Respondent scored a seven on that actuarial instrument, which was "well above average risk" to sexually reoffend. Specifically, respondent was 3.62 times more likely to reoffend "than the typical sex offender score of three on this instrument."

¶ 32 Dr. Nicolai also considered dynamic risk factors, which are empirically associated with an increased risk of sexual recidivism that, unlike the static factors considered by actuarial instruments, can be addressed in treatment and may change over time. She found that respondent exhibited multiple dynamic risk factors, specifically: (1) deviant sexual interest, in that he had a "preference for children and also sexualized violence;" (2) offense supportive attitudes, in that he had a sense of entitlement and blamed others; (3) lack of emotionally intimate relationships with adults, citing respondent's lack of skills to maintain such relationships; (4) lifestyle impulsivity, noting that respondent had been "in over 100 fights;" and (5) resistance to rules and supervision, citing respondent's encounters with TDF staff and security, as well as his violation of probation.

¶ 33 Dr. Nicolai likewise considered protective risk factors, which she described as characteristics or circumstances that help reduce the likelihood of sexual reoffending, such as age, medical conditions, and meaningful completion of sex offender treatment. She found that no factors served to lower respondent's risk of recidivism. Although respondent was in phase four of treatment, Dr. Nicolai did not view this as a protective factor because respondent had not yet meaningfully applied what he learned "to the degree that he will reduce his risk to sexually re-offend."

¶ 34 Based on her review of respondent's records and her training and expertise, Dr. Nicolai opined, to a reasonable degree of psychological certainty, that respondent was substantially probable to sexually reoffend. She concluded that respondent met the criteria to be found an SVP under the Act.

¶ 35 Dr. Barry M. Leavitt

¶ 36 Next, the State presented the expert testimony of Dr. Barry Leavitt, a licensed clinical psychologist and sex offender evaluator retained by the State in May 2018 to conduct an SVP

evaluation of respondent. Dr. Leavitt attempted to meet with respondent at the TDF in June 2018, but respondent declined to participate in the interview. Dr. Leavitt explained that the assessment of whether someone is an SVP is a two-step process. First, the evaluator reviews available records to evaluate whether the individual suffers from medical disorders. Second, the evaluator assesses whether, because of those disorders, the individual has a substantial probability of committing future acts of sexually violent behavior. Like Dr. Nicolai, Dr. Leavitt reviewed numerous records, including respondent's IDOC master record file, criminal history, police reports, disciplinary reports, medical and psychological evaluations, and treatment documents.

¶ 37    In reviewing the police reports and a victim statement concerning respondent's sexual assault of a thirteen-year-old girl in 2004, Dr. Leavitt found it clinically significant that respondent's behavior "only seemed to intensify," and he became "stronger," when the victim pinched him in an attempt to make him stop. "[I]t seemed to be part of his deviant sexual arousal." Regarding respondent's August 2005 arrest for sexual assault of a nine-year-old girl, Dr. Leavitt emphasized that the offense occurred while respondent was on probation, which demonstrated an inability or unwillingness to control his sexually deviant behavior, "even under the conditions of his correctional probation."

¶ 38    In addition to respondent's convictions, Dr. Leavitt reviewed records from the TDF, including documents generated during respondent's participation in the treatment program, where respondent disclosed five additional "contact" victims. He noted that these offenses consisted of "multiple acts of sexually deviant behavior dating back [to] when [respondent] was seven years old continuing up until the age of 18 or 19 when he was incarcerated." Dr. Leavitt observed that there was "a steady proliferation of sexual abuse victims," including victims as young as five years old. The offenses involved "a great deal of force, power, manipulation and control," and

respondent had, in some cases, used physical violence and intimidation. Two were "college age victims" that respondent assaulted while they were asleep, and he had also beaten a pregnant woman with a weapon in an effort to cause her to lose the pregnancy. Respondent had also physically forced himself on an adult victim. In the reports reviewed by Dr. Leavitt, respondent described himself as being particularly aroused by the infliction of coercion, force, power, and control over his victims. He had also reported exposing himself to women in his neighborhood and stealing women's underwear for his sexual satisfaction.

¶ 39  Dr. Leavitt observed evidence of respondent's sexually deviant behavior while housed at the TDF. He noted that respondent sent a seven-page letter to a former TDF dietary employee who had previously sent sexual photographs of herself to the residents. In the letter, which had "strong features of domination," respondent made statements "revealing of longstanding issues around exhibitionism, fetishism, wanting to exercise intense control over a sexual relationship, [and] engag[ing] in sexual acts for his and her pleasure." The letter concerned Dr. Leavitt because "those kinds of fantasies, whether they were encouraged or not, would continue to exist, and they were not really addressed in any comprehensive way in his advanced treatment groups." Dr. Leavitt testified that, for someone with respondent's background, continuing to harbor such fantasies and potentially viewing them as healthy and appropriate was "very concerning." He further noted respondent hid this material from his treatment group. According to Dr. Leavitt, when confronted with the letter, respondent saw it as a violation of his rights and failed to appreciate the concern that the treatment staff had about someone at his advanced stage in the program continuing to harbor such fantasies. Dr. Leavitt acknowledged respondent's October 2018 progress notes reflected the letter was discussed in his treatment group and that he received positive or complimentary feedback. He maintained, however, that the sexualized component of

the letter was avoided and not yet addressed, which Dr. Leavitt found concerning given respondent's advanced stage of therapy at the time. The letter reflected respondent's "ongoing struggle to control his sexual deviant interest and urges." Nevertheless, respondent subsequently advanced to phase four of treatment, and Dr. Leavitt conceded that the letter was not mentioned in respondent's most recent master treatment plan review.

¶ 40    Using the DSM-5, Dr. Leavitt diagnosed respondent with two mental disorders: (1) other specified paraphilic disorder, sexual coercion, nonexclusive type (to non-consensual adult or non-consensual person); and (2) antisocial personality disorder with narcissistic traits. Unlike Dr. Nicolai, Dr. Leavitt did not diagnose respondent with pedophilic disorder. Dr. Leavitt described other sexual paraphilic disorder as a "[s]exual disorder that involves having a history of recurrent sexual interest fantasies, urges or actual behaviors involving the use of coercive sexual force," which the individual engages in, whether in thought or action, over a recurrent six-month period. He explained that a diagnosis of other specified paraphilic disorder requires that the individual's sexual arousal be strongly associated with the use of coercion, force, control or violence toward another person. Dr. Leavitt testified that the diagnosis was appropriate because respondent "described himself as needing to inflict[] use of power, intense power and control to the extent he would sometimes force his subject to submit to his sexual demands or control." He noted that this pattern began in childhood and continued into respondent's young adulthood. As to why the condition persisted, Dr. Leavitt opined that there was evidence of it through at least October 2018, when respondent sent the letter to the former TDF employee, which showed that respondent was "maintaining those fantasies," continued to struggle with them, and required further intervention. He further noted that respondent's exhibitionism was tied to that same drive for power and control, including the desire to observe the victim's reaction.

¶ 41    Dr. Leavitt further testified that he diagnosed respondent with antisocial personality disorder, which he described as "a pervasive disregard for and [disdain] for societal rules and regulations." He explained that individuals with this disorder exhibit "manifestly antisocial traits," such as deceitfulness, dishonesty, impulsiveness, callousness, and placing self and others at risk without regard for safety. In addition, respondent displayed narcissistic traits, which Dr. Leavitt described as having a sense of entitlement, viewing oneself as superior to others, and being "highly exploitive about it." Dr. Leavitt noted that respondent's childhood was "rampant with behavior problems," including acts of theft, violence, sexual abuse, and drug transactions. He also noted that respondent "was a victim, himself," having been sexually abused at age seven. He believed that respondent still suffered from antisocial personality disorder because he "remains inconsistent with respect to his control over certain antisocial traits."

¶ 42    Dr. Leavitt testified that, in his opinion, although respondent had done many positive things in treatment and deserved credit for participating for many years and advancing through the different phases of the program, he remained concerned about certain high-risk factors. Dr. Leavitt stated that respondent had made progress, but "what has concerned me the most at this particular juncture are the continued signs of his high-risk factors under stress." He acknowledged that this was a stressful time for respondent, but observed that, when under stress, there was an emergence of "his criminal thinking [and] antisocial attitude." He noted the ongoing issues of criminal thinking and dysfunctional thought patterns related to respondent's recent approach to the possibility of being placed on conditional release. According to Dr. Leavitt, respondent's records and treatment team confirmed that respondent indicated he would refuse to go on conditional release. Dr. Leavitt observed that respondent had become "increasingly rigid about that possibility," which concerned Dr. Leavitt because "it places the treatment team in a box" and

would limit the types of treatment available to respondent. He further noted that, over the prior year and a half, respondent's participation in treatment had been "highly inconsistent." He noted that when respondent's treatment team confronts him regarding his attendance, only then does he begin attending more regularly, but he later would "blow up" and again stop attending consistently. Dr. Leavitt stated that this pattern was inconsistent with "someone who is this much of a so-called 'leader' within the treatment program."

¶ 43    Dr. Leavitt testified that respondent's two mental disorders interacted in a way that increased his risk for reoffending. He explained that sexual disorder predisposes an individual to sexually violent interaction, while individuals with antisocial personality disorder tend not to follow rules or societal norms because they "see themselves as above it all." As a result, Dr. Leavitt opined that respondent presented a heightened risk for future sexual violence, because he was both internally driven to commit sexually violent acts and externally unconstrained by rules and regulations.

¶ 44    Dr. Leavitt conducted a comprehensive risk assessment to evaluate respondent's likelihood of committing future sexual offenses. On the Static-99R, respondent scored a six, which placed him in the "well above average risk" category. On the Static-2002R risk assessment tool, he scored an eight, which also placed him in the "well above average risk" category. Both scores placed respondent in the highest risk category for their respective instruments. Dr. Leavitt also identified several dynamic risk factors exhibited by respondent, including unresolved trauma, intense mistrust of authority figures, a strong need for power and control, an ingrained antisocial orientation, and deficits in emotional regulation. In Dr. Leavitt's view, respondent's ongoing difficulties with emotional regulation were such that, when faced with stressors associated with his civil commitment proceedings, he tends to revert to dysfunctional coping strategies. He also

identified additional risk factors respondent exhibited, including deviant sexual interest, offense supportive attitude, criminal mindset, lifestyle impulsiveness, grievance hostility thinking, and viewing oneself as a victim. Dr. Leavitt likewise found that no protective, or risk-reducing factors, applied to respondent. Respondent was "relatively young," and so his age was "actually a risk factor." Additionally, respondent had no medical condition that would impede his ability to sexually reoffend.

¶ 45 Dr. Leavitt also considered respondent's participation in treatment. He testified that, "[o]n paper," respondent had done a good job of completing various treatment assignments and goals and had progressed through the treatment program. However, he expressed concern about respondent's inconsistent attendance and treatment approach, noting periods where respondent reverted to old ways of thinking. In Dr. Leavitt's view, these contradictions indicated that "the treatment has not taken hold yet for him." He continued, "[i]t's not taking hold to the extent I would want to see an individual in order to say the treatment has been a success."

¶ 46 Based on the foregoing, Dr. Leavitt opined that there was a substantial probability that respondent would engage in future acts of sexual violence.

¶ 47                                    Dr. Richard Travis

¶ 48 Respondent presented two experts of his own, Dr. Travis and Dr. Rosell, both of whom were qualified as experts in clinical psychology specializing in the evaluation, diagnosis, and treatment of sex offenders. Dr. Travis testified that he had been employed by the Department since 2011 to conduct SVP evaluations under the Act. Along with several other treatment providers, he helped design the TDF's five-phase program, noting that "[t]he bones of the program still exist." He explained that, while the Act is concerned with whether a person poses a substantial risk to

sexually reoffend, the TDF's treatment program is "much more holistic" and addresses a broad range of treatment needs.

¶ 49    Dr. Travis diagnosed respondent with four mental disorders: pedophilic disorder, exhibitionistic disorder, other specified paraphilic disorder (sexual coercion of nonconsenting females), and antisocial personality disorder. He explained that the first three are qualifying mental disorders under the Act. The diagnosis of pedophilic disorder was "based upon [respondent's] sexual offending up to the time he was 18." Dr. Travis noted that in 2008, when respondent was 21 years old, he underwent PPG testing, which did not show arousal to prepubescent girls. Dr. Travis explained that a person's sexual interests are not necessarily fixed at age 18, but by the mid-20s, they generally do not change significantly. Because respondent did not demonstrate sexual arousal to children at age 21, it was unclear whether respondent's past sexual offenses were driven by pedophilic interest as opposed to antisocial behavior, accessibility, or general criminality. He emphasized that the diagnosis could not be removed until respondent had lived in the community for five years "around kids," as the DSM-5 provides that the diagnosis remains in effect until such period has elapsed without the individual acting upon those interests.

¶ 50    Dr. Travis diagnosed respondent with exhibitionistic disorder based on respondent's report of engaging in acts of exhibitionism over several years, as well as the PPG test showing arousal to adult exhibitionistic stimuli. He noted that respondent had "not flashed anybody" in the TDF, which, in Dr. Travis' experience, is the most common form of "sexual acting out" by individuals with exhibitionistic disorder.

¶ 51    Dr. Travis also diagnosed respondent with other specified paraphilic disorder (sexual coercion of non-consenting females), which he described as involving "rape or forced sex." This was based on respondent's reported fantasies. Referring to the PPG results, Dr. Travis noted that

respondent showed some arousal to the adult coercive stimulus category, but not to any of the specific coercive segments presented.

¶ 52    Last, Dr. Travis diagnosed respondent with antisocial personality disorder, explaining that "he still has some of those attitudes," but was "managing this really well." In his experience, such traits tend to "mellow" as individuals age because they are better able to control their behavior and "get tired of getting in trouble."

¶ 53    Dr. Travis, like the other testifying experts, conducted a risk assessment using the Static-99R and Static-2002R actuarial instruments. He acknowledged that respondent's scores placed him in the highest risk category to reoffend but emphasized that these are static instruments, meaning they are "set in stone" because they measure historical factors. Dr. Travis also considered respondent's dynamic risk factors, which are "things that can change with time and treatment," as well as protective factors, which he defined as characteristics or circumstances that reduce an individual's risk of sexual offending. Dr. Travis utilized the STABLE-2007 risk assessment tool and concluded that respondent "still has some of the few factors on the STABLE-2007." However, Dr. Travis compared respondent's 2018 and April 2019 evaluations and noted a slight decrease in these factors which, in his opinion, showed that respondent was benefiting from treatment.

¶ 54    Dr. Travis testified that respondent's advancement to phase four of the treatment plan was a protective factor. He explained that treatment is only effective if the individual uses it, and many complete the program without applying the skills learned. He explained that respondent was "using what he learned to increase his emotional control and also reduce his impulsivity so that he has better control of himself and he's not engaging in those antisocial behaviors." The treatment had also targeted respondent's deviant sexual interests, improved his behavior control, and allowed him to avoid problematic sexual behaviors. Dr. Travis further observed that respondent had

learned to manage his antisocial behavior and had increased his pro-social conduct, noting that he assisted in exposing a "pornography ring" at the TDF and reported inappropriate relationships there, despite coming from a background where you "don't rat out anybody." He further noted that respondent's therapy notes reflected that he "appears to want to be a better person" and had refrained from joining any gangs despite his prior affiliations. He conceded that respondent indicated he did not want to be placed on conditional release because he feared he would be "found by a gang" and would be unable to defend himself without a gun. Dr. Travis testified that respondent still occasionally would make antisocial statements, but his pro-social behavior was nevertheless "exemplary."

¶ 55    From July 2011 through May 2018, Dr. Travis opined that respondent was substantially probable to sexually reoffend, explaining that respondent had not received enough treatment and had not fully implemented the treatment provided. In May 2018, however, Dr. Travis concluded that respondent "had completed enough treatment and *** was using his treatment to the degree that he was no longer substantially probable to sexually reoffend." In March 2019, Dr. Travis briefly returned to the opinion that respondent was substantially probable to sexually reoffend, but he acknowledged that this opinion was based on incomplete and out-of-context information. Specifically, he had labored under the mistaken belief that respondent "had a flareup in antisociality," which, if true, would have indicated that respondent was dangerous and not using the skills learned in treatment. However, on April 8, 2019, after conducting collateral interviews, Dr. Travis again opined that respondent was not substantially probable to sexually reoffend "because of the treatment he received and the way he's used [the] treatment he received."

¶ 56    The April 2019 evaluation, which was the most recent one Dr. Travis had prepared, noted that respondent was managing his sexual behavior in the TDF, with no reports of flirting with

female staff, exhibitionism, boundary violations, or other problematic sexual conduct. Respondent had also disclosed his past sexual offenses, including unreported offenses, and had taken ownership over them and worked to change. Dr. Travis ultimately opined that respondent did not meet the criteria to be found an SVP under the act "because of treatment. He's no longer substantially probable."

¶ 57                                    Dr. Luis Rosell

¶ 58    Dr. Rosell, a licensed psychologist specializing in forensic psychology, testified as respondent's final expert witness. More than six years earlier, respondent's counsel retained him to conduct an evaluation. Dr. Rosell prepared a full evaluation and an addendum, remained informed of respondent's treatment progress, and reviewed the other evaluators' reports. His most recent report was completed in October 2015.

¶ 59    Dr. Rosell acknowledged that respondent's past sexual offenses involving a prepubescent child could satisfy the criteria for pedophilic disorder because they spanned more than six months. However, he noted that respondent's PPG testing in December 2008 showed no arousal to prepubescent children. Dr. Rosell questioned whether respondent ever had pedophilic disorder, noting that evaluators often place too much emphasis on conduct at the time of the offense rather than current functioning. He likewise expressed skepticism about the diagnosis of other specified paraphilic disorder with coercive elements, because the PPG testing showed no arousal to rape, violence, or coercive stimuli. He agreed, however, that respondent met the criteria for antisocial personality disorder, a qualifying mental disorder under the Act.

¶ 60    Dr. Rosell explained that the Static-99R is primarily based on "historical factors" and does not account for treatment progress. Thus, an individual with ten years of treatment could receive the same score on the Static-99R as someone with none, thereby overstating the individual's "true

risk." He acknowledged that respondent's score of six on the Static-99R placed him in the "well above average risk" category, but he cautioned that this label was more alarming than the actual numbers suggested because only about 20% of individuals with this score were later reconvicted or recharged for a sexual offense. Dr. Rosell stated that because the Static-99R is concerned primarily with historical factors, an individual's risk must "be adjusted outside the actuarial."

¶ 61 Turning to dynamic factors, Dr. Rosell noted that many of respondent's risks stemmed from his history of uncontrolled anger, hostility, and impulsivity. In his opinion, respondent had addressed these issues through various treatment groups, classes, and his relapse prevention plan. Dr. Rosell concluded that respondent's assignments had specifically targeted the factors contributing to his past offending, thereby reducing the likelihood of future sexual offending.

¶ 62 Like Dr. Travis, Dr. Rosell opined that respondent's treatment progress had reduced respondent's risk to the point that he was not substantially probable to commit future acts of sexual violence and, therefore, did not meet the criteria to be found an SVP. He emphasized that offenses occurred "early on in his life" and explained that recidivism rates are generally lower for individuals whose offenses occurred during adolescence. He also highlighted respondent's voluntary participation in treatment, including PPG testing, which "a lot of individuals do not do." He also noted that respondent had advanced to phase four of the program, representing approximately 90% completion, and he emphasized that progress was earned rather than automatic. It is "not a program where they push you along," and Dr. Rosell opined that respondent had "done very well to get to phase four." Dr. Rosell testified that he had not reviewed the August 20, 2018, letter respondent wrote to a former employee of the TDF, explaining that it is not unusual in SVP cases for evaluators not to receive every record. He could not recall reading about the

letter in Dr. Travis' evaluation report, but he agreed that it would have been useful to consider when assessing respondent's treatment progress.

¶ 63    On April 25, 2019, the jury found respondent to be a sexually violent person under the Act. The court entered judgment on the jury's verdict, ordered the Department to conduct a predisposition investigation evaluation, and continued the matter for status and a dispositional hearing.

¶ 64                                Posttrial Proceedings

¶ 65    On May 22, 2019, respondent, through retained counsel Schwarzbach, filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

¶ 66    Two days later, on May 24, 2019, respondent filed a *pro se* appearance, a "motion for substitution/appointment of counsel," a notice of appeal, and a motion for extension of time. In the latter motion, respondent listed 13 *pro se* motions he intended to file "before the Honorable Court enter a final order to civil[ly] commit" him, including motions to set aside the jury verdict, substitute the trial judge, change venue, declare a mistrial, and "dismiss" the Act. He further indicated that he intended to pursue motions alleging ineffective assistance of counsel and prosecutorial misconduct, seek sanctions against the Illinois Attorney General's Office, and pursue charges against the Illinois Attorney General. At the next hearing, respondent withdrew his *pro se* filings and notice of appeal, explaining that he filed them to protect his rights after being unable to contact his attorney. He further asserted that the TDF had denied him access to his counsel and had engaged in mail tampering. The case was continued several times while counsel worked with respondent to amend the posttrial motion.

¶ 67    On December 16, 2019, counsel filed an amended motion for new trial alleging, among other things, that the trial court erred in denying respondent's motion to bar Dr. Leavitt's

testimony. The State responded to the motion in February 2020, and the case was continued several times over the following months, likely due to the COVID-19 pandemic.

¶ 68    On July 5, 2020, respondent filed several *pro se* motions, including a motion styled as a "motion for ineffective assistance of counsel." In that motion, respondent asserted that Schwarzbach failed to conduct adequate discovery, mishandled aspects of the case, and did not call him to testify at trial. Respondent further alleged that counsel urged him to plead guilty to offenses he did not commit and advised him to commit perjury. In his prayer for relief, respondent requested a finding that counsel had "intentionally given fraudulently [*sic*] representation" and asked the court to dismiss the petition for commitment and order his immediate release or, in the alternative, grant a new trial. That same day, respondent also filed a *pro se* motion for the appointment of new counsel and a motion for leave to file an amended motion for a new trial, asserting that the motion for a new trial filed by Schwarzbach "intentionally misrepresent[ed] the Respondent['s] pending case." Respondent later filed a *pro se* motion for leave to file an amended motion for ineffective assistance of counsel, an amended motion, and a memorandum of law in support of the amended motion.

¶ 69    On January 25, 2021, the trial court granted Schwarzbach leave to withdraw as respondent's counsel and appointed the Lake County public defender. Despite the appointment of counsel, respondent indicated that he wished to pursue his motion for ineffective assistance of counsel, believing that if he could establish Schwarzbach's ineffectiveness and resulting prejudice, he would be entitled to dismissal. The court advised respondent that, because new counsel had been appointed, it was "not going to deal with you right now directly." The court also informed respondent that, because counsel had been appointed, only counsel could submit filings on respondent's behalf. It cautioned respondent that "[t]here's no such thing as *pro se* pleadings"

from him going forward, as respondent had requested and been provided with appointed counsel. The court continued the matter, including all pending motions and the dispositional hearing, for status of counsel pending confirmation of the specific assistant public defender to be assigned to represent respondent.

¶ 70    Notwithstanding the appointment of counsel, respondent continued to file *pro se* motions. On February 24, 2021, he filed a *pro se* motion to substitute Judge Potkonjak (who presided over the trial) for cause and a motion to compel the circuit clerk to send him file-stamped copies of certain documents in the court file.

¶ 71    The case was continued several times to allow respondent's newly appointed counsel, assistant public defender Jennifer Snyder, to obtain and review the trial transcript and court file, confer with respondent, and determine whether to adopt any of respondent's *pro se* motions. During this period, all pending motions and the dispositional hearing were entered and continued. Meanwhile, in February 2022, the case was transferred from Judge Potkonjak, who presided over respondent's trial, to Judge Charles D. Johnson.

¶ 72    On October 21, 2022, assistant public defender Gavin Robinson appeared on respondent's behalf and informed the court that Ms. Snyder had left the public defender's office. The court then appointed Mr. Robinson to represent respondent, who requested additional time to review the file, confer with respondent, and evaluate respondent's pending *pro se* motions. Respondent expressed frustration that, because he was represented by counsel, he lacked authority to advance any arguments on his own behalf. The court remarked that Mr. Robinson was "excellent" and anticipated that respondent would be pleased with his representation. Respondent also noted that his last evaluation was in 2019 and inquired about obtaining a new one. The court explained that when a litigant "file[s] a certain motion it kind of stalls everything else while we address that

particular motion," and it noted that because "these motions have been pending, the matter had been unable to advance to the dispositional phase.

¶ 73    On December 16, 2022, respondent informed the court that he believed his counsel, Mr. Robinson, was "ineffective" because he had not yet contacted respondent and was, in respondent's view, "inexperienced." He also disputed that Schwarzbach had "removed himself off the case," and he asserted that his "motion for ineffective assistance of counsel" remained pending. At that point, the court remarked that the case had been "going on too long" and emphasized that, although the trial concluded in April 2019, the matter had not yet advanced to disposition due to respondent's pending posttrial motions. The court "strongly encourage[d] the public defender's office to get things moving." The court then continued the matter to January 20, 2023, for a "final status" and indicated that a hearing date would be set at that time.

¶ 74    On January 20, 2023, the trial court noted that the file was "a little long in the tooth" and had reached "Volume 6." It stated that, as a threshold matter, it needed to determine which motions were properly pending, the order in which they should be addressed, and which judge was authorized to hear them. The court remarked that some of the motions had been filed by respondent's former trial counsel, Schwarzbach, others had been filed *pro se*, and some had been amended multiple times. It noted that the May 2019 motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, remained pending, and that respondent had subsequently filed several *pro se* motions, including a "motion for ineffective assistance of counsel" directed at Schwarzbach, a motion for leave to file an amended motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, and a motion to substitute Judge Potkonjak for cause. The court emphasized that, typically, motions to reconsider or for a new trial are heard by the judge who presided over the trial—in this case, Judge Potkonjak. Ultimately, the

court observed that respondent had no right to "hybrid representation," whereby the litigant alternates between self-representation and representation by counsel, and commented that some of the motions "may, in fact, be nullities."

¶ 75 Respondent then asserted that an evaluator had recommended him for conditional release, but that "the State had a bunch of stipulations attached to that" which he intended to "refuse," believing it would not be "fair or right pursuant to the Constitution *** to waive all my rights in order to accept conditional release." The court responded that, before conditional release could be considered, it first had to resolve respondent's pending posttrial motions to determine whether he was properly adjudicated an SVP. The court continued the hearing to allow respondent's appointed counsel, Mr. Robinson, to decide whether to "adopt or amend or not adopt" respondent's *pro se* motion for substitution of judge, which it described as "the key that unlocks the vault of all the other motions."

¶ 76 On February 3, 2023, assistant public defender Robinson informed the court that he declined to adopt respondent's *pro se* motion for substitution of judge because it lacked any merit, and the motion was withdrawn.

¶ 77 Less than one week later, on February 9, 2023, respondent filed a *pro se* "motion for ineffective assistance of counsel against the public defender[s] office." He asserted that appointed counsel, first Jennifer Snyder and later Gavin Robinson, did "absolutely nothing" for his defense, failed to adopt or pursue his pending motions, repeatedly agreed to continuances over his objection, and did not seek an updated evaluation despite his treatment progress. He further alleged that counsel improperly struck his motion for substitution of judge for cause, pressed him to abandon his pending motions in exchange for conditional release, and failed to provide him with trial transcripts and evaluation reports. Respondent also alleged that appointed counsel conspired

with the State by failing to communicate his counterproposal for discharge and instead worked to return the matter to Judge Potkonjak, against whom respondent had filed a motion for substitution. He additionally asserted that, because proceedings under the Act are civil in nature, the public defender "by law" could not represent respondents in SVP matters. He requested that the court find the office of the Lake County public defender "ineffective" and appoint private counsel experienced in SVP proceedings.

¶ 78    On February 10, 2023, at the continued hearing, the court remarked that respondent was "effectively shooting [him]self in the foot" by filing numerous *pro se* motions, which had delayed the disposition of the case and prevented entry of a final, appealable order. It stressed that the case could not progress to a dispositional hearing until respondent's posttrial motion for a new trial was resolved, noting that, although the court had done everything it could to move the case along, respondent was "screwing it up." Respondent then moved orally for a periodic examination, but the court explained that no reexamination could occur until after disposition, which had been delayed by respondent's *pro se* filings. The court advised that respondent's appointed counsel, Robinson, was "an excellent attorney" with experience in SVP cases and cautioned that refusing to communicate with him was not in respondent's best interests. It further explained that respondent could not select his appointed counsel, and that any claim of ineffective assistance of counsel could be raised only on appeal. The court struck respondent's *pro se* motions for ineffective assistance of counsel, explaining that there is "no such thing as a motion for ineffective assistance of counsel. That doesn't exist." It then set respondent's motion for a new trial before Judge Potkonjak. As the court announced the hearing date, respondent interjected, "Hey, Judge. I am not keeping the Public Defender Gavin Robinson." The court replied, "If you don't want to talk to him you are shooting yourself in the foot. It's your foot. Do what you want."

¶ 79    On March 8, 2023, the State filed a motion seeking a "discovery protective order" precluding respondent from seeking discovery through the Freedom of Information Act (FOIA). The State noted that it had already tendered "thousands and thousands" of documents to respondent's counsel related to the case, yet respondent nevertheless submitted five FOIA request's seeking "copies of any and all emails" between the State and respondent's five different attorneys from the inception of the case in 2007 to the present.  It asserted that the request was an attempt to obtain records already produced in discovery and "to further delay this matter."  The State requested that respondent be ordered to "cease *all* pro se contact" with the State, emphasizing that respondent was represented by counsel and that all discovery had already been provided to his attorney.  (Emphasis in original).

¶ 80    On March 10, 2023, the court, with Judge Potkonjak presiding, reminded respondent that he was represented by the public defender and that any *pro se* filings not adopted by counsel would not be considered.  Respondent again demanded that the court appoint private counsel, asserting that the public defender was not "authorized to even touch a sexually violent person's commitment case" because proceedings under the Act are civil in nature.  He also asserted that he had filed a motion to reinstate the motion to substitute Judge Potkonjak for cause, noting that his original motion was "illegally stricken."  The court advised respondent that he was mistaken, explained that the public defender was authorized to represent individuals in SVP proceedings, and that it would not appoint private counsel.  Instead, the court made clear that the public defender's office, specifically assistant public defender Gavin Robinson, would remain as respondent's counsel.

¶ 81    Respondent asserted that, "from this point, I would rather go pro se if the Court is not going to appoint counsel outside of the Public Defender's Office."  Respondent asserted that he disagreed that the public defender was authorized to represent individuals in SVP matters, and he stated, "I

don't waive rights to counsel." He continued, stating "I refuse to accept a public defender." He also persisted in his belief that he was entitled to appointed counsel outside of the public defender's office and that, if he was "not given counsel outside the Public Defender's Office, then I wish to go pro se and not have *** anybody from the Public Defender's Office." He also asserted that, in his motion to reinstate, he stated that if he "wasn't going to receive counsel outside the Public Defender's Office, then [he] would be forced to go pro se."

¶ 82 The court admonished respondent that self-representation was unwise, remarking that "there's an old saying that 'a person that represents himself has a fool for a lawyer.' " Judge Potkonjak added that, in his four decades on both sides of the bench, he "wouldn't represent himself." He cautioned respondent that proceeding *pro se* would likely prolong his confinement because his "interpretation of the law is wrong," his posttrial conduct was "impeding any progress *** towards conditional release," and respondent was proving to be his "own worst enemy." The court stated that, if respondent wished, it would discharge the public defender but emphasized that proceeding *pro se* would be a big mistake. It further clarified that if respondent desired private counsel, he would have to retain and pay for one himself. Finally, the court explained that even with privately retained counsel, the attorney would retain ultimate authority over which motions to file, and if respondent thought otherwise, he was "sadly mistaken." At that point, respondent requested a short continuance so that he could speak with his counsel and decide whether he wished to proceed with counsel, which the court granted.

¶ 83 The court then turned its attention to the State's motion for a protective order. Respondent's counsel indicated he had no objection to the protective order, explaining that because respondent was represented by counsel, "any contacts between the State and the respondent should be through counsel." The court granted the State's motion, admonished respondent not to contact

the State directly or submit additional FOIA requests, reminded him that *pro se* motions would not be entertained unless adopted by counsel, and ordered respondent to seek leave of court before filing any further *pro se* pleadings.

¶ 84    On March 24, 2023, the court held a hearing "to determine whether or not [respondent] wanted to proceed pro se on this matter or continue to be represented by Gavin Robinson from the Public Defender's Office."  Respondent explained that he had spoken with Robinson the prior day and had been "in agreement to keep counsel," but then he "slept on it" and decided that he "wish[ed] to go pro se."  He added that, "one thing that I want to be able to get if I keep counsel" was a copy of the trial transcript "for due process," and that he "want[ed] to be able to assist in [his] defense."  He continued: "I think to move things forward and so I don't be denied certain things, I'm going to ask—I will be forced to go pro se."  Respondent then attempted to raise other matters, but the court clarified: "To be clear, then, you do not wish to have Mr. Robinson or the public defender—Lake County Public Defender's Office to represent you?  You want to go pro se going forward?"  Respondent answered: "Yes.  I wish to go pro se.  I'm asking for the Court to leave the PD office off of my case."

¶ 85    Respondent then immediately sought leave to amend his motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, and requested a hearing date.  He also sought access to his IDOC master record file, various trial documents, and the trial transcript, and orally moved to strike the State's protective order on the ground that, as a *pro se* litigant, he had a legal right to contact the State directly.  The court explained that respondent still could not file any new motions without leave of court, even though he was now *pro se*.  The court initially indicated that "the protective order will be waived," but after the State requested that respondent "put [the motion to strike protective order] in writing," the court clarified: "Actually, that motion,

as far as the protective order, you need—now that you're pro se, you need to put that in writing." The court then granted respondent leave to file a written motion to strike the protective order, noting that the State would be permitted to respond and that the matter would be set for a hearing.

¶ 86    At that point, the State interjected a "suggest[ion] that if he is going to waive representation, Judge, I think he needs to knowingly and intelligently waive that right. And I think he also needs to be fully advised of the perils of pro se." The court stated that it "did that last time when he said he wanted two weeks to talk to Mr. Robinson," and it reiterated that respondent could waive counsel if he wished, but that doing so was "probably the worst thing you can do" and would prolong his time at the TDF. It additionally stated: "I'm just advising you, again, you have the right to an attorney. I think you made it clear you understand that right to it, that you have a right to an attorney. And you—if you wish to waive it, you waive it."

¶ 87    Respondent immediately replied that some of his FOIA requests "had nothing to do with the SVP thing," and should not have been treated as improper contact with the State. He also asserted that he asked his attorney for a copy of the trial transcript so that he could review it and assist in his defense. He likewise emphasized a desire to leave the TDF, noting that he had been there since age 19 and he was, at the time of the hearing, 36 years old. At that point, the following colloquy transpired:

> "RESPONDENT: Of course I want counsel. I have always expressed that. I want counsel. But if there are certain things that I believe that would prejudice me or hold me back, I think it would be damaging with my future.
>
> ***
>
> And, again, as I said, me and counsel, we talked yesterday. Things was fine. But I do—I would like to have copies of the trial transcripts so I can help with the JNOV that

counsel is going to amend. And I haven't heard—we haven't heard from Counsel. So I'm not trying to say, yeah, I'm going to waive my rights to an attorney. I'm—

THE COURT: Frankly, counsel—

RESPONDENT: I'm willing to keep him.

THE COURT: Frankly, counsel's not going to say anything more. You made the— you made the decision. You wish to represent yourself. So, Mr. Robinson, you know, I guess you're off the hook, is the layman's term.

\*\*\*

For the record, I think the court finds that [respondent] has been advised that he has the right to counsel. He's made a knowing and voluntary—has, in fact, made a knowing and voluntary waiver of his right to counsel and wishes to go pro se. That's his right. So Mr. Robinson and the Public Defender's Office is discharged."

The trial court then ordered that the protective order and the trial transcript be tendered to respondent, and it reiterated that respondent was granted leave to file a written motion to strike the protective order and an amended motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. "That's all he's granted leave to file at this point."

¶ 88    On April 10, 2023, respondent filed a *pro se* motion to compel the State to provide him with a copy of its motion for a protective order and the protective order itself. In that motion, he explained that "respondent went pro se in the pending legal action" on March 24, 2023.

¶ 89    Then, on April 24, 2023, respondent filed a *pro se* motion to reconsider the court's ruling granting the State's request for a protective order, arguing that his appointed counsel, Robinson, provided ineffective assistance with respect to the State's motion for a protective order.

¶ 90    On May 26, 2023, after a hearing at which respondent argued on his own behalf, the trial court denied his *pro se* motion to reconsider the protective order.  In so ruling, the court rejected respondent's contentions that his five FOIA requests were unrelated to his SVP case, that his *pro se* status was a change in circumstances warranting reconsideration, and that he possessed an independent right under FOIA to obtain communications between the State and his prior attorneys. The court explained that respondent had "chose[n] to represent [him]self," and "decided to go pro se," despite being repeatedly warned by the court that it was a "bad idea."  Respondent replied, "All right.  Agreed.  *** I'm agreeing with you."  The court then continued the case to allow respondent to file his amended motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.  Before the hearing concluded, respondent asked to speak with the State "to see if we can try to resolve the case."  The State replied that "the best way to resolve this case is for you to go to disposition and get committed so you can then petition for discharge," adding that this was the only available path to release because respondent did not "want to go on conditional release."  Respondent replied, "[r]ight."  The court noted that "everything's on hold because [respondent] had this motion for a new trial going for some time," as it had by that point pended for four years.

¶ 91    On June 2, 2023, respondent filed an amended posttrial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.  He argued, *inter alia*, that the court erred in denying his motion to bar Dr. Leavitt's testimony where his opinion was "improperly based upon statutory interpretation and [was] therefore inadmissible."  Respondent also moved for leave to file a motion to compel the State to produce copies of the five FOIA requests he had previously submitted to the State.  After the State filed its response, the court allowed respondent

to further amend the motion. Over the State's objection, the trial court continued the matter for hearing on respondent's posttrial motion and for dispositional hearing.

¶ 92    On September 21, 2023, following a hearing at which respondent argued *pro se*, the trial court denied his amended posttrial motion.

¶ 93                                    Dispositional Hearing

¶ 94    The proceedings then immediately moved to the dispositional phase. The court advised respondent that he could elect to "be considered for a conditional release plan." If he chose not to participate, however, "the Court would just commit [him] to the custody of the [Department] for control, care, and treatment in a secure setting and that [his] commitment to the [Department] would continue until further order of the Court." The court further explained that, should respondent opt to pursue conditional release, it would direct the Department to prepare a conditional release plan and would continue the matter for a hearing on that plan. Otherwise, the court would enter an order reflecting that respondent had declined conditional release and commit him to the Department's custody.

¶ 95    In response, respondent asserted that the trial court failed to hold a hearing on his "motion for ineffective assistance of counsel" directed at his former attorney, Schwarzbach. The court advised that respondent was free to argue that Schwarzbach was ineffective if he wished, and respondent did so, asserting that Schwarzbach prevented him from testifying at trial and advised him to lie under oath by admitting to offenses that he did not commit. The State countered that respondent's motion became moot once counsel withdrew and, in any event, the challenged conduct reflected trial strategy and respondent had failed to demonstrate that counsel's representation fell below an objective standard of reasonableness.

¶ 96    The State announced that it was ready to proceed with the dispositional hearing. Respondent, however, noted that he had not received the predisposition investigation report, dated January 5, 2023, which recommended him for conditional release. The State conceded that it had mistakenly sent the report to respondent's former public defender, Robinson, rather than to respondent directly. It stated that it would send the report to respondent unless he wished to proceed to the dispositional hearing without it.

¶ 97    Respondent acknowledged that he had previously informed staff at the TDF, and even the court itself, that he would "not take CR," because he "had faith in the court and the court system that somebody will hear [him] out where [he's] not SVP," such that conditional release "wouldn't even matter." He then added that, "clearly now we [are] at that stage," and he emphasized that he had not received the report. The court continued the hearing to give respondent an opportunity to review the report. Respondent then immediately sought leave to file a motion to dismiss and a motion to change venue, which the court denied, stating, "we're way past that."

¶ 98    The court explained that the matter would next be up for the dispositional hearing, and that it would be "off call" unless respondent elected to pursue conditional release. It clarified that, if respondent agreed to conditional release, he would be "moved out of [the TDF] and moved into an apartment somewhere and start going forward with the rest of [his] life." Otherwise, if he declined conditional release, he would remain at the TDF. The court advised respondent to "think about it" and not "be hasty," adding that if respondent preferred to "sit in [the TDF] rather than in [his] own apartment somewhere, that's [on him]." The court continued the case to October 27, 2023, for dispositional hearing and to permit respondent to review the report.

¶ 99    On October 19, 2023, respondent filed a *pro se* notice of appeal seeking to appeal "the judgment from the trial court that was entered against him in September 2023." That same day,

he also sent a letter to the trial court stating that, on October 13, 2023, he was "shaken down by security and others at [the Department], who took his 'electronics and legal documents.' "

¶ 100   On October 27, 2023, respondent did not appear at the dispositional hearing, and the matter proceeded in his absence.  The State reported that it had "just received an e-mail" from TDF staff with an attached "writ refusal form" indicating that respondent "is refusing to appear today, and he refused to sign the writ refusal form as well."  The State further clarified that it sent respondent a copy of the predisposition investigation report.

¶ 101   The trial court noted that, at the prior hearing, it had denied respondent's amended posttrial motion, continued the matter for a dispositional hearing, and admonished respondent to consider conditional release despite his prior repeated statements that he did not want conditional release. It also observed respondent's pattern of filing repetitive *pro se* motions and pleadings, often without leave of court, which it regarded as calculated efforts to delay resolution of the proceedings.  The court reiterated that it had advised respondent that conditional release was his best avenue for relief because, although he would be subject to numerous restrictions, it would remove respondent from the TDF, which respondent had previously identified was his goal.  The court also stated that respondent was aware of the court date and inquired whether this was the first time respondent refused to appear.  The State explained that it was respondent's first refusal "[i]n recent times," but that, earlier in the case, "there was a period of time where he refused a lot."

¶ 102   The trial court found that respondent was "not sick" but had "willfully failed to appear," concluding that, based on his past conduct, respondent's failure to appear was a "calculated attempt *** to postpone the Court's ruling."  The court found, based on the predisposition investigation report, that conditional release was the least restrictive environment in which respondent could be safely managed and treated to reduce his risk of future sexual violence.  Nonetheless, it concluded

that, based on respondent's refusal to appear and his "past and repeated statements that [he] does not want to participate in the conditional release program," respondent had declined to participate in that program. The court therefore ordered that he be committed to the Department until further order of court.

¶ 103    Respondent timely filed a notice of appeal.

¶ 104                                    II. ANALYSIS

¶ 105    Respondent raises three issues on appeal.[1]  First, he argues that the trial court erred in denying his motion *in limine* seeking to bar Dr. Leavitt's trial testimony.  Second, he argues that the court deprived him of his statutory right to counsel during posttrial proceedings.  Third, he maintains that the court erred in conducting the dispositional hearing in his absence and, as a result, deprived him of his right to be present at that proceeding.  We address each contention in turn.

¶ 106    The Act authorizes the involuntary civil commitment of a person adjudged to be an SVP for "control, care and treatment until such time as the person is no longer a sexually violent person." 725 ILCS 207/40(a) (West 2022).  A "sexually violent person" is defined as, *inter alia*, one who has been convicted of a sexually violent offense and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence.  725 ILCS 207/5(f) (West 2022).  In turn, the Act defines "[m]ental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence."  *Id*. § 5(b).  Once the State files a petition, the court must hold a hearing to determine whether there is probable cause to believe the person is an SVP.  *Id*. § 30(b); *In re Commitment of Brown*, 2012 IL App (2d) 110116, ¶ 13.  If,

---

[1]No claim of ineffective assistance of trial counsel is raised on appeal, and counsel expressly stated during oral argument that such a claim would not have succeeded.

after a hearing, the court determines that probable cause exists, it must order that the person be taken into custody and transferred to an appropriate facility for evaluation as to whether the person is an SVP. 725 ILCS 207/30(c) (West 2022); *Brown*, 2012 IL App (2d) 110116, ¶ 13. At trial, the State bears the burden of proving the allegations in the petition beyond a reasonable doubt. 725 ILCS 207/30(d) (West 2022); *Brown*, 2012 IL App (2d) 110116, ¶ 13. Although proceedings under the Act are civil in nature, individuals subject to commitment are nevertheless afforded certain procedural safeguards comparable to those afforded to criminal defendants. *In re Detention of Hardin*, 391 Ill. App. 3d 211, 216 (2009), *aff'd*, 238 Ill. 2d 33 (2010).

¶ 107                    A.  Section 35(b) of the Act

¶ 108   Respondent first contends the trial court erred in denying his motion *in limine* seeking to bar the testimony of the State's retained expert, Dr. Leavitt. He argues that section 35(b) of the Act, which governs trials on the State's petition to adjudicate an SVP, limits the State's expert witnesses to the IDOC evaluator (here, Dr. Nicolai) and the Department psychologist (here, Dr. Travis) and does not authorize the State to call an independent expert of its choosing. In other words, respondent maintains that, because section 35(b) permits the State to present expert testimony from the IDOC evaluator and Department psychologist, it necessarily prohibits the State from presenting testimony from any other expert witness. Respondent acknowledges that the State was entitled to not call Dr. Travis after he changed his opinion and concluded respondent was no longer substantially probable to commit acts of sexual violence, but he contends that section 35(b) did not allow the State to replace Dr. Travis with another expert of its choice. Respondent asserts that the court departed from the Act's procedural framework and unfairly prejudiced him by allowing Dr. Leavitt—who was neither an IDOC evaluator nor a Department psychologist—to testify at trial. The State responds that section 35(b) is permissive, not restrictive. In its view, the

provision authorizes the State to present testimony from both the IDOC evaluator and Department psychologist, rather than requiring it to choose between them, but it does not bar the State from calling additional qualified experts.

¶ 109   This issue presents a question of law requiring us to interpret section 35 of the Act.  It pertinently provides:

> "(b) At the trial on the petition it shall be competent to introduce evidence of the commission by the respondent of any number of crimes together with whatever punishments, if any, were imposed.  The petitioner may present expert testimony from both the Illinois Department of Corrections evaluator and the Department of Human Services psychologist."  725 ILCS 207/35(b) (West 2018).

¶ 110   In construing section 35(b) of the Act, we are guided by the well-settled rules of statutory construction.  Our primary goal is to ascertain and give effect to the intent of the legislature.  *People v. Schoonover*, 2021 IL 124832, ¶ 39.  The best indication of the legislature's intent is the statutory language itself, which must be given its plain and ordinary meaning.  *People v. Ramirez*, 2023 IL 128123, ¶ 13.  In doing so, we consider the words and phrases in the context of other relevant statutory provisions.  *People v. Hunter*, 2013 IL 114100, ¶ 13.  When the language is plain and unambiguous, we may not read in exceptions, limitations, or conditions that the legislature did not express.  *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2014 IL App (1st) 132011, ¶ 35.  Additionally, we presume that the legislature did not intend to create absurd, inconvenient, or unjust results.  *Hunter*, 2013 IL 114100, ¶ 13.  We review the interpretation of a statute *de novo*, meaning we give no deference to the trial court's interpretation of the statute.  *Kloeppel v. Champaign County Board*, 2021 IL App (4th) 210091, ¶ 15.

¶ 111   Applying these principles, we agree with the State.  The plain and ordinary language of section 35(b) provides that, at a trial on the State's petition to have a respondent declared an SVP under the Act, the State "*may* present expert testimony from both the [IDOC] evaluator and the [Department] psychologist." (Emphasis added.)  The legislature's use of the word "may" reflects that the provision is permissive, or "optional in nature," rather than mandatory or restrictive.  See *Salsitz v. Kreiss*, 198 Ill. 2d 1, 11-12 (2001) (rejecting argument that Supreme Court Rule 307 mandates an interlocutory appeal, noting that the word "may" signals an option and not a requirement, and did not preclude a litigant from seeking review of an interlocutory order after final judgment).  Put simply, section 35(b) gives the State the option to call both the IDOC evaluator and Department psychologist, but nothing in this section prohibits the State from presenting other evidence or testimony.

¶ 112   Our reading of section 35(b) is consistent with our prior decision in *In re Commitment of Hardin*, 2013 IL App (2d) 120977, where we rejected an argument like the one respondent now advances.  In *Hardin*, the State presented testimony from a parole officer at the respondent's SVP trial concerning his noncompliance with his MSR conditions.  *Id*. ¶¶ 3-4.  On appeal, the respondent argued that his parole officer should not have been permitted to testify.  *Id*. ¶ 13.  We disagreed, holding that section 35(b) did not bar the testimony.  *Id*. ¶ 20.  We emphasized that this provision provides only that "the State may present expert testimony from both an evaluator with the [IDOC] and a psychologist with the [Department]," and we explained that "[n]othing in this section limits the State to that evidence.  If the State were so limited, section 35(b) would use language indicating that such evidence is the *only* evidence that can be used to support the State's allegation that the respondent" is an SVP.  (Emphasis in original.)  *Id*. ¶ 16.  We also noted that

the respondent's interpretation would impermissibly insert limitations that the legislature did not include. *Id.*

¶ 113   Here, respondent attempts to distinguish *Hardin* by emphasizing that, in that case, the challenged witness was a lay witness—a parole officer, not an expert witness.   That factual distinction is unavailing.   Our analysis in *Hardin* turned not on the type of witness but on the scope of section 35(b).   Again, we expressly held that nothing in section 35(b) limits the State to the IDOC evaluator and Department psychologist, and that adopting such a view would impermissibly insert a limitation into the Act that the legislature did not provide.   That holding applies with equal force here, where respondent likewise seeks to narrow the statute's plain language to exclude testimony that the legislature did not bar.   Like our observations in *Hardin*, had the legislature intended to limit the State to only those two witnesses, it could have said that the State "may *only* present expert testimony from the Illinois Department of Corrections evaluator and the Department of Human Services psychologist, or both," or used other limiting language.   See *Brown*, 2012 IL App (2d) 110116, ¶ 16 (explaining that the plain language of section 35(b) speaks to the testimony the State may present, not the number of evaluations it may obtain, and "[n]othing in the language of this section or any other section of the statute prohibits the State from obtaining more than two evaluations").   Reading section 35(b) as respondent urges would require us to engraft into the Act a restriction that the legislature did not express, which we may not do.

¶ 114    Other provisions in the Act, which must be read harmoniously with section 35(b), reinforce our determination.   See *Hunter*, 2013 IL 114100, ¶ 13 ("[a] court must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation").   Section 15(f), which governs the contents and filing of an SVP petition, provides "[t]he State has the right to have the person evaluated by experts chosen by the State."   725 ILCS

207/15(f) (West 2018).  Similarly, Section 25(e) provides that, before trial, "[t]he State has the right to have the [respondent] evaluated by an expert chosen by the State," who "shall have reasonable access to the [respondent] for the purpose of *** examination," and the respondent's "past and present treatment records and patient health care records."  725 ILCS 207/25(e) (West 2018).  Section 30(c) of the Act, which neither party cites in their briefs, further confirms this point.  It provides that "[n]otwithstanding the provisions of Section 10 of the Mental Health and Developmental Disabilities Confidentiality Act, all evaluations conducted pursuant to this Act *** shall be admissible at all proceedings held pursuant to this Act, including the probable cause hearing and the trial."  725 ILCS 207/30(c) (West 2018).  The sweeping language in section 30(c) makes no distinction between evaluations performed by an IDOC evaluator and Department psychologist as contemplated in section 35(b), and those performed by an expert selected by the State under sections 15(f) or 25(e).  Because section 30(c) ensures that "all evaluations" conducted pursuant to the Act are admissible at trial, it would be illogical for the Act to expressly allow for the admission of such evaluations, including those prepared by an expert chosen by the State under sections 15(f) and 25(e), yet prohibit the evaluator who prepared the report from testifying and being subject to cross-examination on his or her opinion.  See *Hunter*, 2013 IL 114100 (courts presume the legislature did not intend absurd, inconvenient, or unjust results).  Such a construction would also conflict with section 25(c)(3), which expressly affords respondents the right to cross-examine witnesses.

¶ 115   Taken together, these provisions, as well as our decision in *Hardin*, foreclose respondent's narrow reading of section 35(b).  Accordingly, the trial court did not err in denying his motion *in limine*, because Dr. Leavitt's testimony was authorized under the Act.  Because we conclude that section 35(b) did not preclude Dr. Leavitt's testimony, respondent's related claim that the evidence

would have been insufficient to support the jury's finding absent that testimony necessarily fails. In any event, even if Dr. Leavitt had not testified at trial, the jury would not have been obligated to credit respondent's two experts over Dr. Nicolai, who, as the State's sole expert, alone could provide a sufficient evidentiary basis for the jury's verdict. See *People v. Smith*, 185 Ill. 2d 532, 541 (1999) (the testimony of a single credible witness is sufficient to convict).

¶ 116                                  B.  Waiver of Counsel

¶ 117   Respondent next argues that the trial court deprived him of his statutory right to counsel under the Act during "critical [posttrial] stages of his SVP proceedings."  He contends that the court erred in concluding that he validly waived his right to counsel and elected to proceed *pro se*. In his view, although he initially expressed a desire to discharge the public defender's office and proceed *pro se*, he "changed his position" near the end of the March 24, 2023, hearing, which the court had convened "to determine whether or not [respondent] wanted to proceed pro se on this matter or continue to be represented by Gavin Robinson from the Public Defender's Office."  He emphasizes that, after the court warned about the perils of self-representation, he stated: "I want counsel.  I have always expressed that.  I want counsel," "I'm not trying to say, yeah, I'm going to waive my rights to an attorney," and "I'm willing to keep him."  Respondent maintains that, notwithstanding these "unequivocal statements," the court cut him off, disregarded his express desire for counsel, declared that he had already "made the decision," and forced him to ultimately argue his posttrial motion without the assistance of counsel.

¶ 118   Although proceedings under the Act are civil in nature (*In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 54) the Act affords respondents several rights analogous to those guaranteed by the Sixth Amendment, including the right to be represented by counsel and the right to be present.  725 ILCS 207/25(c)(1) (West 2022); *Gavin*, 2014 IL App (1st) 122918, ¶ 54.

Specifically, section 25(c) of Act provides: "[a]t any hearing conducted under this Act, the person who is the subject of the petition has the right: (1) To be present and to be represented by counsel. If the person is indigent, the court shall appoint counsel." *Id*. As with any right, the right to counsel may be waived. To effectuate waiver, the request must be "clear and unequivocal, not ambiguous." *People v. Burton*, 184 Ill. 2d 1, 21 (1998). Additionally, a respondent "waives his right to self-representation unless he 'articulately and unmistakably demands to proceed *pro se*.' " *Id*. at 22 (quoting *United States v. Weisz*, 718 F.2d 413, 426 (1983)).

¶ 119   In determining whether a waiver of counsel is clear and unequivocal, courts consider "the overall context of the proceedings" (*id*. at 22) as well as the individual's conduct following the request for self-representation (*id*. at 24). We consider the entire record, and "[t]he determination of whether there has been an intelligent waiver of the right to counsel *** depend[s], in each case, upon the particular facts and circumstances of that case, including the background, experience, and conduct of the accused." *People v. Washington*, 2016 IL App (1st) 131198, ¶ 55. The purpose of requiring that the waiver be clear and unequivocal is twofold: to (1) prevent the defendant from appealing [either] the denial of his right to self-representation or the denial of his right to counsel, and (2) prevent the defendant from manipulating and abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se*. *People v. Mayo*, 198 Ill. 2d 530, 538 (2002). In this regard, courts " 'indulge in every reasonable presumption against waiver' of the right to counsel." *People v. Baez*, 241 Ill. 2d 44, 116 (quoting *Brewer v. Williams*, 430 U.S. 387, 404 (1977)).

¶ 120   We review a trial court's decision to accept a waiver of counsel for an abuse of discretion. See *In re Commitment of Edwards*, 2021 IL App (1st) 200192, ¶ 35 (citing *People v. Justice*, 349 Ill. App. 3d 981, 988 (2004)). This deferential standard recognizes that trial courts are in a superior

position to assess a litigant's demeanor, capacity, and clarity of intent firsthand. See *Burton*, 184 Ill. 2d at 22. An abuse of discretion occurs only where the court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *Baez*, 241 Ill. 2d at 106.

¶ 121   On this record, we are not persuaded that the trial court abused its discretion in finding that respondent knowingly and voluntarily waived his statutory right to counsel under the Act during posttrial proceedings. This determination is supported not only by respondent's statements during the March 24, 2023, hearing, but also by the broader context of the proceedings leading up to that hearing, in which respondent repeatedly rejected representation by the Lake County Public Defender's Office and expressed frustration that, so long as he remained represented, his numerous *pro se* motions would not be considered by the court unless adopted by counsel.

¶ 122   These dynamics came to a head on February 3, 2023, when assistant public defender Robinson informed the trial court that he would not adopt respondent's *pro se* motion to substitute Judge Potkonjak for cause, stating that it lacked merit. Faced with a deluge of unresolved posttrial motions filed *pro se*, the court had previously continued the matter to give Robinson time to determine whether to adopt that particular motion, which the court described as "the key that unlocks the vault of all the other motions." The court explained that, before it could address respondent's various posttrial filings, including his motion for a new trial and *pro se* "motion for ineffective assistance of counsel" against Schwarzbach, it first had to determine which judge should rule on them. But because respondent was represented by appointed counsel, none of his *pro se* filings could be entertained unless Robinson chose to adopt them. The court reiterated that respondent had no right to "hybrid representation" and warned that any *pro se* motions not adopted by counsel would be treated as legal "nullities."

¶ 123   Less than one week later, on February 9, 2023, respondent filed a six-page *pro se* motion entitled "motion for ineffective assistance of counsel against the public defender['s] office." There, he raised a broad range of allegations against both his prior public defender, Jennifer Snyder, and his current public defender, Robinson.   He claimed that neither attorney had contributed to his defense, accused them of ignoring his preferred motions, repeatedly sought continuances over respondent's objection, and failed to request an updated psychological evaluation despite what he described as significant treatment progress.  Most notably, respondent asserted that Robinson's decision to not pursue respondent's motion for substitution of Judge Potkonjak for cause was a retaliatory "attack" against him for refusing the State's proposed terms of conditional release, and it was a calculated effort to silence respondent.  He further alleged that Robinson had conspired with the State to conceal his counterproposal for discharge from the court and to redirect the case to Judge Potkonjak, whom respondent believed demonstrated significant bias and prejudice against him.  Lastly, respondent argued that, because SVP proceedings are civil in nature, the public defender lacked authority to represent him.  He asked the court to find that the Lake County Public Defender's Office was "ineffective" and appoint private counsel with experience in SVP proceedings.

¶ 124   At the continued hearing on February 10, 2023, Robinson informed the court that he had spoken with respondent several times about the motion for substitution of judge, but after informing respondent that he would not proceed on it, respondent refused to speak with him. The court noted that respondent had once again filed a *pro se* motion for "ineffective assistance of counsel," and it addressed respondent's claims head-on. It reiterated that Robinson was "an excellent attorney" skilled in SVP cases, and it cautioned respondent that refusing to speak with Robinson would harm his case.  It further explained that respondents in civil commitment

proceedings have no right to select their appointed counsel and that any claim of ineffective assistance could only be pursued on appeal. The court struck respondent's *pro se* motion for ineffective assistance of counsel against the public defender's office, stating that it was not a legally cognizable pleading. As the court scheduled a hearing on respondent's posttrial motion before Judge Potkonjak, respondent objected, stating: "Hey, Judge. I am not keeping the Public Defender Gavin Robinson." The court replied, "If you don't want to talk to him, you're shooting yourself in the foot. It's your foot. Do what you want."

¶ 125    Respondent's position remained unchanged at the March 10, 2023, hearing before Judge Potkonjak. Once again, respondent insisted that the public defender's office lacked legal authority to represent individuals in SVP proceedings and claimed that Robinson had "illegally stricken" his motion for substitution of judge. The court squarely rejected these arguments, clarified that the public defender's office was authorized to represent respondents under the Act, and stated that it would not appoint counsel outside of that office. It further reaffirmed that Robinson would remain as respondent's appointed counsel. In response, respondent declared that he "would rather go pro se if the Court is not going to appoint counsel outside of the Public Defender's Office," while emphasizing that he did not wish to "waive rights to counsel." He categorically "refuse[d] to accept a public defender," including "anybody from the Public Defender's Office," and asserted that he had "state[d] clearly" that if the court would not appoint outside counsel, he "would be forced to go pro se." The record confirms that, at that point, the court strongly cautioned respondent against self-representation and noted that respondent's *pro se* approach would likely prolong his confinement. It noted that his interpretation of the law was misguided, his posttrial conduct had greatly hindered his progress toward conditional release, and that he was proving to be his "own worst enemy." The court offered to discharge Robinson as counsel but emphasized

that it would be a big mistake. It noted that respondent could retain private counsel at his own expense but that, even then, counsel would have the final say on what motions to file. After the court finished its admonitions, respondent disagreed that he was "trying to be [his] own worst enemy," and the court granted a short continuance for respondent to consult with Robinson.

¶ 126    Two weeks later, on March 23, 2023, the trial court reconvened to determine whether respondent wished to continue with his public defender or proceed *pro se*. Respondent initially stated that he had spoken with Robinson the previous day and had been "in agreement to keep counsel" but, after sleeping on it, he decided that he "wish[ed] to go pro se." He explained that, "one thing I want to be able to get if I keep counsel" was a copy of the trial transcript "for due process," and that he "want[ed] to be able to assist in [his] defense." He continued: "I think to move things forward and so I don't be denied certain things, I'm going to ask—I will be forced to go pro se." Respondent then attempted to raise other matters pending before the court.

¶ 127    At that point, the court sought to clarify respondent's intentions, asking: "To be clear, then, you do not wish to have Mr. Robinson or the *** Lake County Public Defender's Office represent you? You want to go pro se going forward? Respondent unequivocally replied, "Yes. I wish to go pro se. I'm asking for the Court to leave the PD office off of my case." This statement, given after proper admonitions about the perils of self-representation, reflected a clear and unequivocal waiver of counsel. See *People v. Khan*, 2021 IL App (1st) 190679, ¶ 67 (noting that if a defendant's waiver of counsel is made freely, knowingly, and intelligently, the court must accept it, even if it deems the choice unwise); *Baez*, 241 Ill. 2d at 115-16 (emphasizing that the right to self-representation may be invoked only through a clear and unambiguous waiver).

¶ 128    The record confirms that the trial court immediately accepted respondent's waiver of counsel and recognized him as a *pro se* litigant. Following his express waiver, respondent

promptly sought leave to amend his motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, requested a hearing date, and orally moved to strike the State's protective order on the ground that, as a self-represented party, he had a legal right to contact the State directly. The court engaged with him accordingly. It stated that, although he was now *pro se*, respondent still needed to seek leave of court before filing new motions. The court initially remarked that "the protective order will be waived," but it later revised its position in response to the State's request for a written motion from respondent, stating: "Actually, that motion, as far as the protective order, you need—*now that you're pro se*, you need to put that in writing." (Emphasis added.) The court then granted respondent leave to file a written motion to strike the protective order and commented that the State would be permitted to file a written response. These actions confirm that the court not only accepted respondent's waiver but also expressly recognized and treated him as a self-represented litigant consistent with his clear and unequivocal request to proceed *pro se*.

¶ 129 In his appellate brief, respondent downplays this portion of the proceedings as merely showing that he "initially expressed a desire to discharge the public defender," but that description understates the proceedings. Respondent went further—He clearly and unequivocally invoked his right to self-representation, and the court expressly recognized him as proceeding *pro se* and, from that point forward, treated him as such. On appeal, respondent does not expressly dispute the court's determination that, at that point, he was proceeding *pro se*, nor does he dispute that his statement—"I wish to go pro se. I'm asking for the court to leave the PD off of my case," made in response to the court's direct inquiry, constituted a clear and unambiguous waiver of his right to counsel. Instead, he contends that *later* remarks, made after the court again (at the State's request) admonished him that self-representation was unwise, show that he "changed his position."

Respondent denies on appeal that he wished to represent himself and asserts that "the trial court did talk [him] out of representing himself," but then "ignored [his] explicit request for counsel." In support, he points to several statements made toward the end of the March 24, 2023, hearing, including: "Of course I want counsel. I have always expressed that. I want counsel," "I'm not trying to say, yeah, I'm going to waive my rights to an attorney," and that he was "willing to keep him."

¶ 130 Respondent's argument is unpersuasive. When read in context, the statements he now highlights do not undermine the trial court's finding that he knowingly and unequivocally waived his right to counsel. As the State points out, respondent's statement: "I want counsel, I have always expressed that. I want counsel," and "I'm not trying to say, yeah, I'm going to waive my rights to an attorney," was not a renewed request for representation in general, but a reiteration of his longstanding desire that he be appointed private counsel outside of the public defender's office. This distinction is critical. Indeed, respondent made similar statements at the March 10, 2023, hearing, wherein he repeatedly refused to accept counsel from the public defender's office while professing a desire not to "waive rights to counsel." These statements were consistently accompanied by the clarification that, if the court refused to appoint private counsel, he would proceed *pro se*. See *People v. Rainey*, 2019 IL App (1st) 160187, ¶¶ 67-68 (holding that "a request for self-representation is not unclear or equivocal merely because it was a fallback to the defendant's first but unavailable choice of private counsel," and explaining that even when self-representation is expressed as a fallback, behind an option that the trial court cannot and will not grant, the request for self-representation remains clear and unequivocal). When respondent later remarked that he was "willing to keep" counsel, the court reasonably understood this not as a withdrawal of his waiver but as a conditional willingness to accept counsel only if counsel agreed

to adopt his *pro se* motions and act as a conduit for his preferred litigation strategy. In other words, contrary to respondent's argument, the record does not show that the court "ignore[d]" an "explicit request for counsel," but rather, having observed his words and demeanor firsthand, the court did not reasonably interpret the comment as such—especially in light of respondent's repeated rejection of continued representation by the public defender. That understanding is reinforced by the court's later comments, made after it denied respondent's posttrial motion, that it had repeatedly tried to dissuade respondent from proceeding *pro s*e but that he persisted nonetheless: "Lord knows the Court tried to talk you out of representing yourself, and the Court didn't feel it was in your best interest. *** I'd never represent myself, but you wanted to. And Lord knows we tried. The Court on numerous occasions tried to get you not to represent yourself."

¶ 131 Respondent's subsequent pleadings and statements confirm that the trial court did not abuse its discretion in determining that respondent wished to represent himself. See *People v. Lesley*, 2018 IL 122100, ¶ 51 ("[t]he entire record should be considered in determining whether the waiver was knowingly and understandingly made"). After the court granted him leave to file a motion to reconsider the protective order, respondent filed such a motion with an accompanying affidavit stating: "Respondent is not represented by counsel. In fact, on 3/24/2023 Respondent went pro se as the Court did not want to give respondent counsel outside the Public Defender Office." At the hearing on that motion, respondent reiterated: "I was always against counsel— legal representation from counsel. I said I'll go pro se. I represent myself. And so that was that." He further argued that his *pro se* status was a change in circumstances warranting reconsideration of the protective order, but the court interrupted: "No, no, no. That's something you chose. That is not a change of circumstances. That is—that has nothing to do with it. *** I advised you at the time, bad idea, and—but it's your position. That is not a change in circumstances." Respondent

replied, "All right. Agreed," and "I'm agreeing with you." In total, respondent filed six *pro se* motions after the court granted his request for self-representation, and at no point did he request the reappointment of counsel. These actions underscore that his waiver of counsel was both knowing and unequivocal. Finally, at a hearing on September 21, 2023, which was the last court date before the dispositional hearing, respondent confirmed that he "did not want the Public Defender's Office to represent [him]," and that his waiver of the public defender was "on [the] transcripts."

¶ 132   In sum, the record shows that respondent repeatedly and explicitly stated that he wished to represent himself rather than proceed with an appointed public defender, both before the court allowed him to represent himself and afterwards. The trial court therefore acted within its discretion in finding that respondent knowingly and voluntarily waived his right to counsel.

¶ 133                           C.  Waiver of Presence

¶ 134   Respondent's final argument on appeal is that the trial court erred in finding that he willfully waived his right to be present at the dispositional hearing and, by proceeding to conduct the hearing in his absence, deprived him of that right. A respondent subject to a petition under the Act has the right to be present at any hearing conducted under the Act (725 ILCS 207/25(c)(1) (West 2022)) but, as with any right, the right to be present can be waived (*Edwards*, 2021 IL App (1st) 200192, ¶ 35). The right to be present is waived only where "there is a knowing and voluntary relinquishment of a known right." *Edwards*, 2021 IL App (1st) 200192, ¶ 37. We review the trial court's finding that respondent knowingly and voluntarily waived his right to be present under an abuse of discretion standard, which occurs only where the court's ruling is arbitrary, fanciful or unreasonable, or where no reasonable person could take the view adopted by the court. *Id.* ¶ 35.

¶ 135   We conclude that the trial court did not abuse its discretion in finding that respondent voluntarily waived his right to be present at the dispositional hearing.  After years of protracted posttrial proceedings while respondent changed counsel and filed numerous *pro se* posttrial motions, the matter finally turned to respondent's disposition on September 21, 2023.  The court informed respondent that, if he wished to be considered for conditional release, it was prepared to enter an order finding that conditional release was appropriate and directing the Department to prepare a conditional release plan.  If, however, respondent opted not to participate, the court would commit him to the Department for treatment in a secure facility until further order of court, and the matter would be taken "off call."  It was "up to [him]."  The court further advised respondent that the predisposition investigation report, dated January 5, 2023, recommended him for conditional release.

¶ 136   The State acknowledged that it had mistakenly sent the report to respondent's former counsel, Robinson, instead of respondent directly, and inquired whether respondent would be willing to proceed without reviewing it.  Respondent acknowledged that he had previously told staff and even the court that he would "not take CR" because he expected the SVP finding would be overturned, rendering conditional release irrelevant. At the same time, however, he added that "clearly now we [are] at that stage," and emphasized that he had not yet received the predisposition investigation report. The court continued the case to October 27, 2023, to give respondent an opportunity to review the report and decide whether to pursue conditional release.

¶ 137   Despite this opportunity, respondent failed to appear at the October 27, 2023, hearing.  The State reported that the TDF had transmitted a writ refusal form indicating that respondent declined transport and had refused to sign the form. The trial court found that respondent was aware of the hearing date, was "not sick," and had "willfully failed to appear," concluding that his absence was

another calculated effort to delay the court's ruling. That finding was consistent with the court's prior observations of respondent's conduct, as he had filed numerous dilatory *pro se* motions and openly stated that he believed conditional release "wouldn't even matter." Respondent's efforts to delay his disposition continued even during the September 21, 2023, hearing, when after the court denied his amended posttrial motion, he requested a hearing on his claim that Schwarzbach had rendered ineffective assistance of counsel and sought leave to file motions to dismiss the commitment petition and to change venue, which the court immediately denied.

¶ 138 Additionally, respondent consistently indicated that he would refuse conditional release. Dr. Leavitt testified at trial that respondent's treatment team confirmed respondent repeatedly asserted that he would refuse to go on conditional release, and that he had become "increasingly rigid about that possibility," which Dr. Leavitt found troubling because it limited his available treatment options. Similarly, Dr. Travis testified that respondent reported that he would refuse conditional release because he feared being "found by a gang" and would be unable to protect himself without a gun. Respondent himself echoed this reluctance at the January 20, 2023, hearing, wherein he said he would "refuse" conditional release because the State's proposed stipulations would require him to "waive all [his] rights." He again made similar statements in court in May 2023, when, after the State remarked that respondent did not "want to go on conditional release," he replied, "[r]ight."

¶ 139 Against this backdrop, the trial court was entitled to treat respondent's failure to appear as a deliberate waiver of his right to be present rather than an inadvertent absence. While respondent's comments on September 21, 2023, left open the possibility that he might reconsider conditional release after reviewing the predisposition investigation report, his subsequent refusal to attend the hearing confirmed that he had no intention of pursuing conditional release. Given

the corroborating expert testimony, his own repeated statements, and the circumstances surrounding the October 27, 2023, hearing, the trial court's finding that his absence was willful was not unreasonable. Accordingly, we hold that the court acted within its discretion in finding that respondent knowingly and voluntarily waived his statutory right to be present at the dispositional hearing and proceeding with the hearing in respondent's absence.

¶ 140                           III. CONCLUSION

¶ 141   For the foregoing reasons, we affirm the orders of the circuit court of Lake County denying respondent's motion to bar the State's independently retained expert and finding that respondent knowingly and voluntarily waived his statutory rights to counsel and to be present at the dispositional hearing.

¶ 142   Affirmed.